NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240711-U

NO. 4-24-0711

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 17, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE CITY OF SOUTH BELOIT, a Body Politic and Corporate, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) | Winnebago County |
| v. | ) | No. 22MR307 |
| NEW CHAPTER GROUP INC., an Illinois Corporation; TEK ENTERPRISES INC., d/b/a SERVEPRO OF SOUTHWEST WAUKESHA COUNTY, a Wisconsin Corporation; ARIVA HOSPITALITY, INC., d/b/a THE GARDEN HOTEL AND CONFERENCE CENTER, an Illinois Corporation; and UNKNOWN OWNERS AND NON-RECORD CLAIMANTS, | ) ) ) ) ) ) ) | |
| Defendants | ) | Honorable |
| (New Chapter Group Inc., an Illinois Corporation, Defendant-Appellant). | ) ) | Ronald Anthony Barch, Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Harris and Justice Lannerd concurred in the judgment.

**ORDER**

¶ 1     *Held*: (1) Expert testimony by a civil engineer supports the conclusion that repairing the Garden Hotel and Conference Center (Hotel), which the circuit court authorized the City of South Beloit (City) to demolish, would have made no economic sense.

(2) The evidence in the record does not require a finding that the City prohibited the owner of the condemned Hotel from entering the Hotel for the purpose of remediating code violations.

(3) The doctrine of unclean hands is inapplicable unless the party against whom the doctrine is asserted seeks equitable relief.

(4) The evidence could reasonably support a finding that the City gave the owner of the Hotel fair notice of code violations before suing for authorization to demolish the Hotel and for the imposition of fines.

(5) The affirmative defense of failure to exhaust administrative remedies can be raised only against a plaintiff who seeks judicial review of an administrative decision.

¶ 2    The City of South Beloit, Illinois (City), brought an action in the Winnebago County circuit court for two forms of relief: (1) authorization to demolish the Garden Hotel and Conference Center (Hotel) and (2) municipal fines against the Hotel's owner, New Chapter Group Inc. (New Chapter), for code violations that New Chapter allowed to go uncorrected in and around the Hotel. After a bench trial, the court entered a judgment in the City's favor and against New Chapter, giving the City permission to demolish the Hotel after the passage of 30 days and imposing fines upon New Chapter and, if the City demolished the Hotel, a lien in the City's favor for the cost of demolition.

¶ 3    On three grounds, New Chapter appeals.

¶ 4    First, New Chapter argues that the circuit court should have ruled in its favor on its affirmative defense of unclean hands. We find no error in the denial of this affirmative defense. For one thing, the evidence did not require a finding that the City had unclean hands in its dealings with New Chapter. Also, the doctrine of unclean hands was inapplicable absent a request by the City for equitable relief. New Chapter does not establish, by citation to relevant authorities—or even claim—that an authorization to demolish a building and the imposition of municipal fines for code violations are remedies a court of equity could have awarded before the merger of law and equity.

¶ 5    Second, New Chapter argues that the City failed to carry its burden of proof in its action for permission to demolish the Hotel. Specifically, New Chapter argues that the City failed to prove that the cost of repairing the Hotel exceeded the Hotel's value. We hold that the

circuit court could reasonably regard that proposition as having been proven by the testimony of a civil engineer.

¶ 6 Third, New Chapter argues that because the City failed to exhaust its administrative remedies, we should vacate the fines. This argument makes no sense, considering the plaintiff in this case, the City, does not seek judicial review of an administrative decision.

¶ 7 Finding no merit in those three arguments that New Chapter makes in its brief, we affirm the circuit court's judgment.

¶ 8                                    I. BACKGROUND

¶ 9                                    A. The City's Complaint

¶ 10 On August 5, 2022, in the Winnebago County circuit court, the City filed a complaint against New Chapter (and other defendants, who have not appealed). The complaint was made up of two counts. Count I invoked section 11-31-1(a) of the Illinois Municipal Code (65 ILCS 5/11-31-1(a) (West 2022)) and sought an order requiring that New Chapter "demolish, repair, enclose[,] and remediate all hazards and code violation issues at the Property," namely, the Hotel, the address of which was 200 Dearborn Avenue in South Beloit. Additionally, count I requested that the order include an alternative provision: if New Chapter failed to take those remedial measures, the City, in its discretion, would be allowed to do so, and the City would "have a judgment" against New Chapter, as well as a lien on the property, "for all costs associated with the demolition, repair, enclosure, and/or remediation." Count II invoked the general penalty section of the City's code of ordinances (South Benoit Code of Ordinances § 1-8 (eff. Aug. 17, 2020)) and sought a judgment for day-by-day fines upon New Chapter because of continuing code violations.

¶ 11                                    B. The Initial Inspections of the Hotel

- 3 -

¶ 12　　　　　Shawna Henthorn, who was formerly the City's code enforcement officer, testified in substance as follows.

¶ 13　　　　　The City had passed ordinances adopting the International Property Maintenance Code and the International Building Code. Whenever the City received a complaint that property in the City had a defect that possibly violated those standards, Henthorn's responsibility, as the code enforcement officer, was to go to the property, perform an inspection, and issue violation notices and hearing notices as necessary.

¶ 14　　　　　On February 26, 2019, when Henthorn was still the City's code enforcement officer, she received a phone call from a parent, who reported that a school soccer team had stayed at New Chapter's Hotel over the weekend of February 22 to 24, 2019, and that all the children who had swum in the green-tinted water of the Hotel's pool had become ill, apparently from a bacterial infection.

¶ 15　　　　　Henthorn e-mailed Victoir Wilder, the code enforcement officer for the Winnebago County Health Department (Health Department), suggesting that they perform a dual inspection of the Hotel. The county, like the City, had a property code, but while the City dealt primarily with the perimeter or exterior of buildings, the county dealt primarily with the safety and sanitariness of building interiors.

¶ 16　　　　　The dual inspection of the Hotel by Henthorn and Wilder took place in early March 2019. For Wilder, it was a reinspection of the Hotel. When Henthorn e-mailed Wilder the previous month, he already was aware of the problem with the pool and had already gone to the Hotel and performed an inspection of his own, in which he had found that not only did the pool lack chlorine, but the basement of the Hotel was flooded and its roof leaked. He "was working with Nicole White, who stated that she was some sort of a manager at the property" (to quote

Henthorn's testimony). Wilder "took [Henthorn] around to show [her] the violations that he had previously encountered." The pool was closed, and Henthorn saw "significant water in the basement." She took photographs of a mildewed wall, from which paint was peeling. She also took photographs of the flooded basement as it was being pumped out, and there was "debris all over" the basement floor.

¶ 17                              C. The Initial Administrative Hearing

¶ 18          The Health Department was responsible for enforcing the International Property Maintenance Code, which, like the City, the county had adopted by ordinance. On March 12, 2019, Wilder sent a hearing notification to New Chapter. The notice stated that an administrative hearing had been scheduled for March 22, 2019, at the Health Department's office in Rockford, Illinois, to address "the violations" at the property. The notification read, "We will require a representative that is assigned to make decisions and approve repairs to be present at the hearing. A signed contract to repair the roof, the basement issues[,] and the interior water damage must be submitted at the time of the hearing." The notification warned New Chapter, "Failure to comply with the Winnebago County Health Code or with any notice issued in accordance with the Code shall be cause for a court suit to be filed against you by the Winnebago County States' [*sic*] Attorney's Office."

¶ 19          The administrative hearing took place as scheduled. White appeared on behalf of New Chapter as its property manager. According to an "In-House Hearing Summary," White presented three bids, by "Apex, Excel, and Great Lakes Roofing," but "none [of these bids] were signed." It was agreed that the City and the Health Department would inspect the property on March 25, 2019, and that if, on that date, "the bids [were] not signed and/or work completed,"

the Health Department would revoke New Chapter's hotel permit. In any event, the "In-House Summary" said, the Hotel was to "be vacated immediately and maintained in a secured fashion."

¶ 20          D. The Letter From New Chapter to the Health Department

¶ 21          In a letter dated May 25, 2019, New Chapter's "secretary" (whose signature is illegible) informed the Health Department that New Chapter had "decide[d] to voluntarily close the Hotel effective immediately." The letter promised, "We will continue to accept bids to repair the roof, basement[,] and other interior water damages and do our best to bring the hotel up to code as soon as possible, and we will keep your department update[d] periodically."

¶ 22          E. Follow-Up Inspections of the Hotel

¶ 23          Several times after their initial inspection in March 2019, Henthorn and Wilder returned to the Hotel to see if any progress had been made in remediating the defects. Henthorn saw no progress. During a reinspection on April 24, 2019, she took photographs of the disintegrating parking lot, garbage, fallen tree limbs, weeds, overgrown grass, and a broken door.

¶ 24          F. The Administrative Notice of Code Violations

¶ 25          On May 2, 2019, the City issued to New Chapter a document titled "Notice of Code Violation." According to the notice, the City's Code Enforcement Division had inspected the property and found violations. The notice then listed various sections of the International Property Maintenance Code, the City's code of ordinances, and Illinois statutory law that were violated, requesting that, by May 12, 2019, these violations be corrected. We quote portions of the list of violations in the notice:

> "• S.B.Ord.Sec. 14-101.—Property Maintenance Code Adopted.
>
> • S.B.Ord.Sec. 14-191.—Location of numbers.
>
> • S.B.Ord.Sec. 14-192.—Size of numbers.

• S.B.Ord.Sec. 34-56.—Nuisance defined.

• S.B.Ord.Sec. 34-57.—Duty of maintenance of private property.

• S.B.Ord.Sec. 14-161.—[Dangerous Buildings] Defined.

• S.B.Ord.Sec. 14-162.—Declared nuisance.

• S.B.Ord.Sec. 14-164.—Abatement generally.

• S.B.Ord.Sec.[ 34-62.]—Tall grass, plants, weeds and ground cover declared public nuisance.

***

• 65 ICLS 5/11-20-7. Cutting and removal of neglected weeds, grass, trees, and bushes.

• 65 ICLS 5/11-20-12. Removal of infected trees.

• S.B.Ord.Sec. 118-181.—CR commercial retail district.

• S.B.Ord.Sec. 118-183.—CT commercial traffic district.

• S.B.Ord.Sec. 118-342.—Application of article provisions.

• S.B.Ord.Sec. 118-343.—Additional regulations; parking ***.

• S.B.Ord.Sec. 118-345.—Schedule of requirements.

• S.B.Ord.Sec. 1-8.—General penalty for violation of Code; continuing violations; nonpayment of fine and costs.

• IPMC 108.1.2 Unsafe Equipment.

• IPMC 301.2 Responsibility.

• IPMC 301.3 Vacant structures and land.

• IPMC 302.3 Sidewalks and Driveways.

• IPMC 302.4 Weeds.

- IPMC 304.1 Exterior Structure. General.

- IPMC 304.2 Protective treatment.

- IPMC 304.7 Roofs and drainage.

- IPMC 305.1 Interior structures. General.

- IPMC 305.3 Interior surfaces.

- IPMC [P] 507.1 Storm Drainage. General.

- IPMC 303.l Swimming Pools, Spas, and Hot Tubs. Swimming pools.

- IPMC 501.2 Plumbing Facilities and Fixture Requirements.

Responsibility.

- IPMC [P] 504.1 Plumbing Systems and Fixtures. General."

¶ 26    The notice added, "A complete list of ordinances can be found on our website southbeloit.org under the documents tab." Under her signature, Henthorn typed her office phone number and cell phone number.

¶ 27    G. The Administrative Summons

¶ 28    According to Henthorn's testimony, New Chapter performed no remediation within 10 days after receiving the "Notice of Code Violation," nor did New Chapter request additional time for remediation. Therefore, on May 20, 2019, Henthorn issued to New Chapter a "Report of Violation and Summons to Appear." After listing the same violations as before, this document commanded that New Chapter appear before an administrative hearing officer on June 19, 2019, at 1:30 p.m. in the council chambers at City Hall in South Beloit to present any witnesses and cross-examine the City's witness, Henthorn. The document warned that if New Chapter failed to appear at this administrative hearing, the hearing officer might enter a default judgment and impose fines, costs, and other sanctions.

¶ 29    No one appeared on New Chapter's behalf at the administrative hearing on June 19, 2019. Instead of entering a default judgment and imposing fines, costs, and other sanctions, however, the City voluntarily dismissed the administrative case.

¶ 30    At trial, New Chapter's attorney asked Henthorn:

"Q. Okay. Were you physically there when the [administrative] case was called?

A. Yes.

Q. Okay. And it was just dismissed?

A. That's correct.

Q. Okay. You voluntarily dismissed it?

A. It was—yes, it was voluntarily dismissed.

Q. Mm-hmm. And what was the reason again that you voluntarily dismissed it?

A. So it could be filed in circuit court."

¶ 31    H. The Condemnation of the Hotel as Unfit for Occupancy

¶ 32    Henthorn identified a photograph of a condemnation sign affixed to the door of the Hotel. According to this sign, which was dated September 17, 2019, and signed "VW," the Hotel, by order of the Health Department, was condemned as unfit for human occupancy. The sign cited section 108 of the International Property Maintenance Code as adopted by section 18-400 of the Winnebago County Code of Ordinances and stated that "APPROVAL MUST BE OBTAINED TO RE-OCCUPY THIS Building."

¶ 33    On September 14, 2020, Dr. Sandra Martell, the public health administrator of the Health Department, notified New Chapter, by letter, that the Hotel had been condemned pursuant

to chapter 18, article IX, subsection 108.1 of the Winnebago County Property Code (Winnebago County Code of Ordinances, art. IX, § 18-400 (108.1) (adopted June. 9, 2016)) because the Hotel was "[d]amaged and dilapidated," "[h]azardous," and "[u]nfit for human habitation." (The year's delay between the posting of the condemnation sign and the sending of this letter appears to be unexplained.) This letter from Dr. Martell pointed out that, under subsection 111.1 of the Winnebago County Property Code (Winnebago County Code of Ordinances, art. IX, § 18-400 (111.1) (adopted June 9, 2016)), New Chapter had the right to a hearing regarding the condemnation of the Hotel and cautioned that if, within 20 days after receiving the letter, New Chapter did not request a hearing, the notice of condemnation and notice to vacate the premises would "become final and enforceable orders." (It does not appear that New Chapter requested a hearing.)

¶ 34      Dr. Martell testified that she had written this letter to New Chapter on the basis of photographs taken by her inspector showing water damage from the flooded basement and leaking roof, peeling paint, windows that were open and could not be closed, and the "separation of *** the walkways from the sidewalks." Because of the amount of water pictured in the photographs, Dr. Martell regarded the property as "[d]angerous" and unfit to be lived in.

¶ 35      Dr. Martell "would have expected" that, more than a year after the condemnation notice, "all those deficits would have been corrected." She was asked:

> "Q. But if you don't have access to the property, how can you repair them?
>
> A. That is not part of the Property Maintenance Code. It allows for access to the building to make the necessary repairs. What it does not allow for is occupancy."

Dr. Martell explained that when a building was condemned, "[i]t [was] condemned for occupancy, meaning people [could not] reside or live in that." The building had to be vacated in the sense that people could not live in the building. But "[t]hey can go in to make the necessary repairs"—"In fact," Dr. Martell added, "we want them to make the repairs."

¶ 36 In her testimony, Henthorn took the same position that the Hotel was closed for occupancy but open for repairs. She denied telling representatives of New Chapter "that they were unable to enter into the physical premises of the hotel." She denied telling them that "the hotel had to be closed" and that "they were not allowed to work in the hotel."

¶ 37 I. Further Deterioration in the Hotel After Its Condemnation

¶ 38 1. *The Drone Video*

¶ 39 On July 24, 2023, with judicial approval, the Winnebago County Sheriff's Office used a drone to make a video of the Hotel. At trial, as the video was played, Henthorn pointed out to the circuit court the vandalized entryway, water damage and mildew on the walls and ceiling, the nonfunctioning plumbing, the lack of electrical service, and the unsecured and vacant condition of the Hotel.

¶ 40 2. *The Rotten Roof*

¶ 41 On September 13, 2023, Steven Haas, the City's street superintendent, testified he had been to the Hotel 30 or more times in the preceding few years to secure the building, which was vacant and attracting trespassers. On July 19, 2022, while he was on the roof attempting to close an opening to the building, the roof was spongy and so deteriorated that a tool he was using went through the surface of the roof. He was unaware if New Chapter had taken any measures to repair the roof or secure the property.

¶ 42 J. No Building Permits Requested

¶ 43     The Winnebago County building inspector, Steve Girard, testified that, to make repairs to the Hotel, New Chapter would have had to obtain a building permit from Girard's office. Since 2019, according to Girard's testimony, no building permits had been requested for repairs to the Hotel.

¶ 44     Girard, who "had 30 years in the construction trade," further testified that, in about 2019, he participated in a walk-through inspection of the Hotel. The Hotel, he recalled, "was basically in shambles." The equipment in the basement was "inundated with water" and probably had to be replaced. No building permit had ever been issued to replace the water-damaged equipment. For that matter, Girard did not think that, in good conscience, he could issue a building permit to put new equipment in the basement, considering that the Hotel had been built on a floodplain. If the equipment were replaced, the new equipment would have to be installed above ground, one foot above the floodplain.

¶ 45                    K. The Expert Opinion of a Civil Engineer

¶ 46     The City called, as an expert witness, Seth Gronewold, a civil engineer who was employed as the City's engineer. The City's attorney asked him what training he had undergone in "estimating construction costs for building repairs." Gronewold answered, "It's something ***
that's done frequently. So my experience in the nine years now working in the industry, just doing multiple different structural observations which *** typically require estimates of cost to be completed along with the evaluation of the structure." On "hundreds" of occasions, he had "prepared an engineer's opinion of probable cost for construction projects."

¶ 47     Gronewold further testified essentially as follows. On October 15, 2021, he participated in the execution of an administrative warrant to search the property. To take part in the search, he had to put on a hazmat suit and ventilation mask because the building was

contaminated with mold and mildew. He wrote a report of what he saw in the walk-through inspection. He saw a leaky roof, which had caused water damage throughout the Hotel, including damage to the interior drywall, drop ceilings, structural components, flooring, and carpeting. Algae in the swimming pool had damaged the filtration equipment and heating equipment. Fifty large windows were broken, exposing the interior of the Hotel to the elements. Shattered glass was scattered throughout the Hotel. Judging by the height of the water stain on the basement walls, water had submerged the equipment, which was rusted. Thus, if the Hotel were rehabilitated, all the equipment in the basement (or the "mechanicals," as Gronewold called them) would have to be replaced—and unless the basement could be waterproofed, a mechanical room would have to be constructed on the ground floor, above the floodplain, and the new equipment would have to be installed there. The presence of asbestos throughout the Hotel, on heating pipes, for example, and in floor tiles, would complicate such repairs—or, for that matter, demolition.

¶ 48          Gronewold concluded that the Hotel was dangerous and damaged beyond repair and that it ought to be demolished. He reckoned that the cost of remediation—about $7 million by his estimate—exceeded the value of the building. In 2023, according to the parties' stipulation, the property had an assessed value of $499,836.

¶ 49          On cross-examination, New Chapter's attorney asked Gronewold if, in estimating the "probable cost of the remediation of this building," he had "obtain[ed] bids from contractors." Gronewold answered, "No, I put together an engineer's estimate of probable cost." New Chapter's attorney asked, "Without consulting actual contractors who would be performing the job?" Gronewold answered, "I guess that would be the purpose of an engineer's estimate of probable cost. It's based on my professional opinion, based on my knowledge of local costs

within the area typically applied to, you know, construction efforts of this nature."

¶ 50                                    L. Testimony by New Chapter's President

¶ 51            Dr. Zhanghai "Michael" Zhang testified in substance as follows. He was the president of New Chapter, the company that owned the Hotel. The manager of the Hotel, Ariva Hospitality, Inc., of which White was an employee, sent him the "In-House Hearing Summary" when she received it. He admitted signing the letter of March 25, 2019, to the Health Department, in which New Chapter expressed a commitment to continue accepting bids to repair the roof, basement, and other interior water damage.

¶ 52            Dr. Zhang testified that on March 25, 2019, he received a phone call from White and the Hotel's manager, Linda Zhang. They were calling from the Hotel lobby and told him that the City's code enforcement officer, Henthorn, was at the Hotel and had "ask[ed] everybody [to] leave." Someone in the Hotel lobby handed the phone to Henthorn, and Dr. Zhang spoke with Henthorn, who confirmed to him that nobody was supposed to be "at the hotel at all at this time" (to quote Dr. Zhang's testimony). The reason that she gave to Dr. Zhang was that "no contract[s] are signed"—by which he understood her to mean "[r]oofing contracts."

¶ 53            New Chapter's attorney asked Dr. Zhang if "there [were] any contractors working on the property that day," on March 25, 2019. Dr. Zhang answered that workers from an "environmental plumbing company," Collins Sanitary, LLC (Collins), were there. The Hotel was located on a floodplain, Dr. Zhang testified, and Collins was there that day pumping water out of the Hotel's basement. According to Dr. Zhang's testimony, Henthorn "asked [Collins] to leave" because "the older door [had to] be shut," even though "that [was] the only pump [to] take the basement water out." Dr. Zhang asked Henthorn to send him a text so that he would have something in writing to take to the shareholders, and Henthorn complied: she sent him a text "to

*** ask *** Collins to leave because nobody [is] allowed inside the Hotel. All doors must be shut. And that is the only pump [to] take water out from the basement." (Here we quote Dr. Zhang's testimony instead of the text message itself, which, it appears, was never offered in evidence. At least, in New Chapter's brief, we see no citation to this text as an exhibit.) It was Dr. Zhang's belief that Henthorn told Collins to leave the Hotel and that Collins did so. "[A]ll the doors [were] shut that day," Dr. Zhang recounted.

¶ 54          New Chapter's attorney then had Dr. Zhang identify defendant's exhibit No. 12: invoices from Collins for the pumping of water, the installation of pumps, and travel time on March 8, 11, and 18, 2019.

¶ 55          When asked, at trial, on November 14, 2023, why he had not repaired the property, Dr. Zhang answered that he had "receive[d] on May [2, 2019,] only one notice of a violation," which "list[ed] all the laws, all the statutes," but "[n]o evidence at all." When asked if he hired anyone to work on the property in 2023, he answered, "This year City control the property. No." When asked if he spent any funds or hired anyone to "work on the property to clean up the problems at the property in 2022," he answered no. When asked if, in 2021, he or a contractor did "any work to maintain or bring the property into a usable condition," he answered no.

¶ 56                    M. E-Mails From the City's Attorney to New Chapter

¶ 57          In his testimony, Dr. Zhang admitted that, on November 22, December 13, and December 23, 2019, he received e-mails from the City's attorney, Aaron Szeto.

¶ 58          In the e-mail of November 22, 2019, Szeto listed the code violations; the number of days the violations had been in existence, without counting the preceding six days (May 2 to November 14, 2019: 196 days); and the maximum possible fine that New Chapter faced through

November 14, 2019: $2,704,800. He enumerated and described the violations as follows:

"SOUTH BELOIT CODE OF ORDINANCES

S.B. Ord. Sec. 14-191: Location of Numbers & IPMC[F] 304.3: Premises identification

> - $750 fine, per day. $750 x 196 = 147,000.00
>
> -There are no numbers anywhere on the building. The only numbers are door numbers inside.

S.B. Ord. Sec. 14-192: Size of Numbers

> -$750 fine, per day. $750 x 196 = 147,000.00
>
> -There are no numbers anywhere on the building.

S.B. Ord. Sec. 14-162: Declared nuisance

> -$750 fine, per day. $750 x 196 = 147,000.00
>
> -They have a building that is dangerous to the public health because of its current condition. The building lacks proper repair and there is stagnant water in the basement.

S.B. Ord. Sec. 14-163: Maintenance and occupancy

> -$750 fine, per day. $750 x 196 = 147,000.00
>
> -The building is dangerous and is in a dangerous condition because of the stagnant water and the repairs that need to be made.

S.B. Ord. Sec. 14-164: Abatement generally

> -$750 fine, per day. $750 x 196 = 147,000.00
>
> -The building is unsafe and should be repaired or demolished.

S.B. Ord. Sec. 34-57: Duty of maintenance of private property

-$750 fine, per day. $750 x 196 = 147,000.00

-The property has weeds, wrappers, cups, and other garbage. In the back, by the shed, there are broken chairs and table setting strewn about.

S.B. Ord. Sec. 34-62: Tall grass, plants, weeds and ground cover declared public nuisances

-$300 fine, per day. $300 x 196 = $58,800

-There are weeds growing in the parking lot and places there shouldn't be. There is also grass that gets mowed by the City.

S.B. Ord. Sec. 118-343: Additional regulations; parking

-$750 fine, per day. $750 x 196 = 147,000.00

-Need to maintain parking lot, can't be crumbling or have pot holes. The whole lot has crumbling black top, holes in the parking lot. Cement is crumbled near bushes.

INTERNATIONAL PROPERTY MAINTENANCE CODE

IPMC 108.1.2: Unsafe Equipment

-$750 fine, per day. $750 x 196 = 147,000.00

-Plumbing and heating is broken or damaged. Some rooms don't have units in them and those rooms should be secured, but they are not.

IPMC 301.3: Vacant Structures and land

-$750 fine, per day. $750 x 196 = 147,000.00

-The structure is vacant but is not maintained as if it is being lived in which is required.

IPMC 302.3: Sidewalks and Driveways

-$750 fine, per day. $750 x 196 = 147,000.00

-Maintenance like the driveways, weeds growing and holes and crumbling cement

IPMC 304.1: Exterior Structure. General

-$750 fine, per day. $750 x 196 = 147,000.00

-Outside of the building under the windows they have panels that are popping off due to water damage in several different places. Whole structure is showing wear.

IPMC 304.2: Protective treatment

-$750 fine, per day. $750 x 196 = 147,000.00

-Outside panels are popping off due to water damage.

IPMC 304.7: Roofs and drainage

-$750 fine, per day. $750 x 196 = 147,000.00

-Roof leaks into the structure.

IPMC 305.1: Interior structures. General

-$750 fine, per day. $750 x 196 = 147,000.00

-There is leaking and crumbling of walls on the inside.

IPMC 305.3: Interior surfaces

-$750 fine, per day. $750 x 196 = 147,000.00

-Water damages, cracked paint, plaster that has fallen, and drop ceiling has caved in from holding water.

IPMC[P] 507.1: Storm Drainage. General

-$750 fine, per day. $750 x 196 = 147,000.00

-When operational, the hotel would discharge ground water into parking lot. There are pumps that are supposed to run constantly, but several are broken. Sometimes none worked when the hotel was operational.

IPMC 303.1: Swimming Pools, Spas, and Hot Tubs. Swimming pools

-$750 fine, per day. $750 x 196 = 147,000.00

-No chemicals in it and 25 kids got sick. Health dept shut them down and didn't meet requirements for 3 months. Stagnant water is still there. Pump isn't running because no electricity

IPMC[P] 504.1: Plumbing Systems and Fixtures. General

-$750 fine, per day. $750 x 196 = 147,000.00

-Plumbing is flawed and leaking. Basement has standing water. Not in sanitary condition.

Grand Total: $2,704,800.00."

¶ 59        In bold font, though, Szeto added, "This does not mean the City will seek to impose this amount especially if you have a plan to remediate the violations and ultimately do remediate the violations." Szeto reminded Dr. Zhang that, during a meeting between the parties, four options were discussed: "1) rehabilitate the building; 2) demolish the building; 3) sell the property; and 4) walk away from the property and deed the property to the City in exchange for a waiver of the fines." Szeto requested that New Chapter let the City know, within two weeks, "which of these [four] remediation plans *** [New Chapter] want[s] to pursue." At this point, it was unnecessary, Szeto wrote, that New Chapter "have the actual plan or details of the plan figured out for that option," but it was necessary to at least choose an option. Stasis was not an option. Szeto concluded:

"Active progress towards remediation is crucial to the City. The more time that passes without remediation starting, the more the building deteriorates and becomes in worse condition. This is bad for the owner as well as the City. The City will work with the owners on a remediation timeline, however, efforts must be made by [defendant] to make decisions in a timely manner."

¶ 60    On December 13, 2019, Szeto e-mailed Dr. Zhang:

"I am following up on my below email to you as I have not received any response. I am disheartened as I truly felt during our meeting that all parties understood that communication would be a crucial factor in resolving this matter and that we were all committed to keeping open lines of communication."

Again, Szeto asked Dr. Zhang which of the four options New Chapter wished to pursue. Szeto wrote:

"I ask that you please let me know as soon as possible what course of action the owners desire to pursue. The City does not want to take control of the property. The City would much rather let the owners decide how the property will be remediated and used in the future. However, if the owners are not going to pursue remediation in a timely fashion, the City has no choice but to move towards taking control of the property."

¶ 61    On December 23, 2019, Szeto e-mailed Dr. Zhang that "over the last two weeks or so, the hotel ha[d] been broken into two times." The City had entered the Hotel to make sure that no one was in the Hotel and "then took the necessary steps to secure the building by closing and boarding up the windows and doors that were open." Szeto urged Dr. Zhang to "take steps to have the hotel properly secured and monitored to ensure that people do not get into the hotel"—a

"huge safety concern in light of the fact that the [H]otel [was] currently condemned."

¶ 62                                          N. The Software Provider

¶ 63          Greg T. Swain testified that he used to work for Bay Lakes Information Systems (Bay Lakes), which had sold some "software that manage[d] guest stays" to New Chapter. This software had been installed on computers in the Hotel. On April 3, 2019, while Swain was still employed by Bay Lakes, he received an e-mail from Dr. Zhang that read:

> "Hotel booked guest must be notified and we need your help. Please contact City of South Beloit Code enforcement officer regarding why no employees are allowed to get access to the property: 200 Dearborn Ave, South Beloit IL61080.
>
> Please help us to get all Hotel clients being informed of Hotel closure."

Dr. Zhang attached to his e-mail a business card, which had the phone number of a City employee. Staff members at Bay Lakes did a Google search and found a newspaper article reporting that the City had condemned the Hotel.

¶ 64          Swain called the phone number on the business card and spoke with Henthorn. He could not remember what exactly Henthorn told him in their phone conversation, but he remembered receiving the impression that the City was "in control" of the Hotel.

¶ 65          On cross-examination, the City's attorney asked Swain:

> "Q. Did anybody from the City *** indicate to you that they were in charge of the hotel and they had assumed management of the hotel?
>
> A. I would—I do not have any written correspondence regarding that. Again, I do believe that there was definitely dialogue that gave me a level of confidence against a particular person of authority, that they were in control of the

property at the point."

¶ 66　　　　When Henthorn was on the stand, New Chapter's attorney questioned her regarding this issue of who controlled the Hotel. He asked her:

"Q. You did not advise Mr. Zhang that he could not access the hotel, correct?

A. Correct. I don't have keys to the hotel. Mr. Zhang does.

Q. So you didn't tell Linda that she could not access the hotel?

A. That's correct.

Q. And you didn't tell Lou that he could not access the hotel?

A. That he couldn't? Correct.

Q. And then you didn't tell Mr. Swain that the City has control over the hotel and nobody was allowed in, correct?

A. That's correct."

¶ 67　　　　According to Henthorn's testimony, Linda Zhang and Lou (last name unspecified) were two individuals who had been living in the Hotel. The City's attorney asked Henthorn:

"Q. *** Previously, you testified that you told these people they could not be at the hotel; is that correct? I guess that's a yes or no on that one.

A. Yes.

Q. What did you mean when you told them that? What was your intention by that statement to them?

A. *** [T]hey weren't able to live at the hotel. Linda and Lou lived at the hotel at the time. They weren't able—under the Winnebago County health order, *** once the hotel was closed, it was closed for remediation purposes. The parties

were *** allowed to be at the property as long as remediation was occurring. If they were trying to get the water out of the basement, they were able to be there. If they were making the repairs to the roof, they were able to be there. They were able to be there to rectify any of the violations that had been presented for remediation purposes. Other than that, they were not able to reside at the hotel."

¶ 68                                    O. The Circuit Court's Decision

¶ 69        In a written decision that it entered on March 28, 2024, the circuit court found in the City's favor and against New Chapter on both counts of the City's complaint. In its concluding part, the decision read as follows:

"1. The Garden Hotel property is dangerous, unsafe and beyond reasonable repair.

2. The Garden Hotel cannot be restored to a state of soundness, efficiency or health.

3. The cost to repair the Garden Hotel far exceeds its stipulated value.

4. The City's request for a demolition order executable in 30 days is heard and granted.

5. The City's request for fines is heard and granted as to 10 separate past and ongoing code violations.

6. The Court grants the City's requests for municipal fines and awards the City the sum of $500.00 per day, per code violation for the period of May 2, 2019[,] through November 14, 2023, for a past fine total in the amount of $8,828,500.00.

7. The court grants the City's requests for municipal fines and awards the

- 23 -

City the sum of $500.00 per day, per code violation ($5,000.00 per day) for the period of November 15, 2023, through the date of demolition.

8. [New Chapter's] affirmative defense of unclean hands and counterclaims for trespass and conversion are denied."

¶ 70 In a footnote to paragraph 8 (the final paragraph quoted above), the circuit court explained:

"First and foremost, the evidence and testimony does not support [New Chapter's] affirmative defense or counterclaims. Secondly, the legislative intent and sound public policy underlying section 11-31-1 do not permit other issues to [be] introduced into a demolition and repair controversy. Such claims only complicate and delay the demolition and repair proceeding, endanger public safety, and defeat the purpose of the statute. *City of Bloomington v Bible Truth Crusade*, 197 Ill.App.3d 793, 795-96 (4th Dist. 1990) (estoppel claim against City properly dismissed)."

¶ 71 The circuit court imposed the fines pursuant to the "General penalty" section of the city's code of ordinances, which provided:

"[W]here no specific penalty is provided therefor, the violation of any such provision of this Code or any ordinance shall be punished by a fine of not less than $100.00 and not more than $750.00 for each offense ***. A separate offense shall be deemed committed on each day that a violation occurs or continues." South Beloit Code of Ordinances § 1-8(a) (eff. Aug. 17, 2020).

The court gave the following justification for its award of $500 per day for each of the 10 code violations:

- 24 -

"The Court finds a $500.00 per day, per code violation fine is appropriate given

the volume and duration of the code violations at issue—now almost 5 full years

for a commercial property that is located at an intersection that is one of the most

prominent and visible intersections in all of [the City]. The per day, per code

violation fine amount is necessary to ensure compliance with code provisions

specifically meant to address safety and health concerns. It is also necessary to

deter others from publicly abandoning their duties as commercial property

owners."

¶ 72        This appeal followed.

¶ 73                                    II. ANALYSIS

¶ 74                                A. The Demolition Order

¶ 75        The supreme court has construed section 11-31-1(a) of the Illinois Municipal

Code (65 ILCS 5/11-31-1(a) (West 2022)) as allowing a court to "authorize the extreme remedy

of demolition" only "if the structure is beyond reasonable repair." (Internal quotation marks

omitted.) *Village of Lake Villa v. Stokovich*, 211 Ill. 2d 106, 128 (2004). In other words,

"demolition is justified only if," given "the current value of the building," "repair makes so little

economic sense that it is unlikely that an owner would make use of any further opportunity to

repair." *Id.* at 131. The cost of repair must be compared to the value of the building. See *id.*

¶ 76        New Chapter argues that, "without supporting estimates or bids from contractors,"

Gronewold's testimony did "not provide the Court with sufficient evidence to sustain the City['s]

*** burden with regards to obtaining an order for demolition." We lack authority to reweigh the

evidence. Our standard of review is deferential. The question for us is whether, by finding that

the Hotel was beyond reasonable repair, the circuit court made a finding that was against the

- 25 -

manifest weight of the evidence. See *id.* A finding is against the manifest weight of the evidence only if the finding is "unreasonable, arbitrary, or not based on evidence." *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995).

¶ 77    Gronewold's expert testimony that it would cost $7 million to repair the Hotel (compared with the property's value of $499,836) was evidence. We cannot say it was unreasonable or arbitrary to rely on Gronewold's testimony in lieu of bids from contractors. Gronewold was a civil engineer with experience in pricing construction work, and he testified he was familiar with local construction costs. Thus, by finding that the Hotel was beyond reasonable repair, the circuit court did not make a finding that was against the manifest weight of the evidence.

¶ 78                              B. Unclean Hands

¶ 79    For an affirmative defense to the City's complaint, New Chapter accused the City of having "unclean hands." Specifically, the affirmative defense alleged as follows. "As of March 25, 2019," the City "obtained wrongful control and dominion over the property in bad faith" and "prohibited [the owner from having] access to the Property." The City "forcefully closed" the Hotel, causing the Hotel to cease earning income. While sitting vacant and unused in the City's control, the Hotel deteriorated. The City made small repairs to the property while neglecting to make larger, necessary repairs. Consequently, the property suffered "degradation" during the City's dominion over the property and New Chapter's exclusion from it, and New Chapter suffered a loss of more than $4 million.

¶ 80    New Chapter claims that, from March 25, 2019, onward, it was "under the justifiable belief that it could no longer access the property until and unless the City *** relinquished control of the property." In support of that claim, New Chapter cites the "In-House

Hearing Summary" signed by White and a hearing officer of the Health Department on March 22, 2019. According to this "In-House Summary," White appeared in the Health Department's South Beloit office that day, and the hearing officer discussed with her the violations that had been observed on the property. White and the Health Department agreed that, by March 25, 2019, New Chapter would remedy the violations or, alternatively, present the Health Department with copies of signed bids to remedy the violations. Otherwise, on March 25, 2019, the Health Department would revoke New Chapter's hotel permit. It was further agreed that "[t]he building must be vacated immediately and maintained in a secured fashion."

¶ 81　　　　Under a commonsense interpretation of the "In-House Summary," to "vacate" the building meant to stop residing in it, because the building was unfit for human occupancy. The "In-House Summary" could not be reasonably interpreted as forbidding all access to the property. By requiring the owner to "maintain[ ]" the building "in a secured fashion," the Health Department necessarily authorized the owner to have access to the property for that purpose. Also, obtaining signed bids for the remediation of the code violations would have been pointless if the property would be inaccessible for the making of repairs. The requirement to obtain bids and to sign them necessarily implied the right to have the work done that was contemplated in the bids.

¶ 82　　　　New Chapter argues in its brief, "Dr. Zhang testified credibly along with other witnesses regarding the justifiable belief that [the owner] could not enter the property in question after March of 2019." That argument is followed by a citation to two pages of the transcript of an evidentiary hearing the circuit court held on November 14, 2023. Both pages are from the testimony of Dr. Zhang alone—no "other witnesses" testified in those pages. In the context of those two cited pages, Dr. Zhang testified that, on March 25, 2019, he received a phone call from

Zhang and White, who told him that the City's code enforcement officer, Henthorn, was at the Hotel and had "ask[ed] everybody [to] leave." Dr. Zhang then spoke with Henthorn, who confirmed to him that nobody was supposed to be "at the hotel at all" (to quote Dr. Zhang's testimony). The reason that Henthorn gave to Dr. Zhang was that "no contract[s] are signed"—by which he understood her to mean "[r]oofing contracts."

¶ 83        New Chapter's attorney asked Dr. Zhang if "there [were] any contractors working on the property that day." Dr. Zhang answered that workers from an "environmental plumbing company," Collins, were there, pumping water out of the basement. According to Dr. Zhang's testimony, Henthorn "asked [Collins] to leave" because "the older door [had to] be shut," even though "that [was] the only pump to take the basement water out." Dr. Zhang asked Henthorn to send him a text so that he would have something in writing to take to the shareholders, and Henthorn complied: she sent him a text "to *** ask *** Collins to leave because nobody [is] allowed inside the hotel. All doors must be shut. And that is the only pump [to] take water out from the basement"—to quote Dr. Zhang's representation of what the text said. It was Dr. Zhang's belief that Henthorn told Collins to leave the Hotel and that Collins did so. "[A]ll the doors [were] shut that day," he testified.

¶ 84        New Chapter's attorney then had Dr. Zhang identify defendant's exhibit No. 12: invoices from Collins for the pumping of water, the installation of pumps, and travel time on March 8, 11, and 18, 2019. It does not appear, however, that New Chapter presented an invoice from Collins for March 25, 2019, although, according to Dr. Zhang's testimony, Collins went to the Hotel that day and pumped water out of the basement or attended to the pumps until Henthorn told Collins to leave. This omission appears to be unexplained. Also, it does not appear that, in the evidentiary hearing, New Chapter presented the alleged text message from Henthorn

to Dr. Zhang in which she told Dr. Zhang that Collins had to leave. This omission likewise appears to be unexplained.

¶ 85       Because the supposed text message from Henthorn to Dr. Zhang would have been on Dr. Zhang's phone and because, generally, recipients of text messages are able to access them and show them, a reasonable trier of fact could arrive at its own explanation for the omission of the text message: the text message, if it was sent, did not say what Dr. Zhang represented it said. Since Dr. Zhang was not present at the Hotel, there is no reason to suppose that he personally heard what, if anything, Henthorn said to Collins. New Chapter asserts that Dr. Zhang testified "credibly." Instead of believing Dr. Zhang, however, a reasonable trier of fact could believe Henthorn, who, according to her testimony, told the owner's representatives they had to stay out of the Hotel unless they were doing remediation work.

¶ 86       New Chapter represents to us that, "[i]n addition to Dr. Zhang's testimony, evidence was presented through Shawna Henthorn's field notes that an employee of [the owner] was told she could not be present on the property." The page of the record that New Chapter then cites is the first page of a "Field Investigation Report" of the "South Beloit Code Enforcement Division." That cited page does not say what New Chapter represents that it says. When we look at succeeding pages of the "Field Investigation Report," however, we see that on April 3, 2019, for instance, Henthorn found that Linda Zhang was in the Hotel and that Henthorn "told her they are not to be at the hotel." It does not appear, however, that Linda Zhang was doing repair work at the time. It seems that, instead, she was attending to customer reservations, because she complained to Henthorn that "Nicole [White] won't help them with customer reservations." The next day, Henthorn telephoned Linda Zhang because when Henthorn "drove by [the] Hotel[,] they were there again." Linda Zhang explained that "they had a lot of paperwork to get." So,

again, the presence of people in the Hotel was apparently unrelated to repair work. Even if Linda Zhang reasonably understood Henthorn as forbidding her to do clerical work in the Hotel, it would have been unreasonable to leap to the conclusion that the City forbade repair work in the Hotel.

¶ 87 According to Henthorn's note for March 25, 2019, in the "Field Investigation Report," it was made clear to New Chapter that people were allowed in the Hotel to make repairs. The note for that date begins by saying that because "no contracts were signed," White agreed that "the Hotel was doing a voluntary closure effective immediately until time to get roof done & basement pumps working." Getting the roof done and the basement pumps working presupposed having access to the Hotel for those purposes. The note continues, "Victor [*sic*] was very specific they were able to be at the hotel (only in the area were work directly affected by the remediation process) from 8 AM-5 pm. The family members were NOT to be staying there." Thus, while some cherry-picked entries from the "Field Investigation Report" could be used to create the impression that no one was allowed in the Hotel for any purpose, the "Field Investigation Report," read as a whole, conveys the meaning that no one was allowed in the Hotel who was not doing remediation work.

¶ 88 As New Chapter puts it, Swain had only an "impression that [the City] was in control of the property after March of 2019." He could not remember specifically what Henthorn said to him, in their phone conversation, that gave him that impression. Because of his lack of memory and his lack of records from his former place of employment, his conclusion that the City controlled the property to the point of forbidding all access could be regarded as unreliable and as based more on what Dr. Zhang had told him than on what Henthorn had told him.

- 30 -

¶ 89        That the City "controlled" the Hotel, whatever that means, would not answer the question of whether New Chapter was permitted to make repairs to the Hotel. Forbidding occupancy of the Hotel was, to be sure, a form of control—but not control that was inconsistent with New Chapter's right to enter its own Hotel for the purpose of fixing the defects that made the Hotel uninhabitable. Arguably, New Chapter understood it would be allowed to make repairs, considering that, on March 25, 2019, Henthorn watched Linda Zhang and Nicole White taping, to the entrances of the Hotel, notices that read as follows: "Garden Hotel closed for repairs. We will keep you updated when repair[s] are finish[ed]!" Surely New Chapter did not think that repairs to its Hotel would be made by the City.

¶ 90        New Chapter asserts that, on August 5, 2022, when the City "filed its complaint seeking condemnation and ordinance fines," the City "had control of the property for over three years and it appears at that time the property was in fact in a dilapidated state due to the actions of the City *** in prohibiting New Chapter *** from entering the property." Thus, New Chapter attempts to shift responsibility from itself to the City. The attempt is unconvincing. On November 22, 2019, only two months after the Hotel was posted as condemned, Szeto reminded Dr. Zhang that one of New Chapter's options was to "rehabilitate the building." If, through Szeto, the City suggested to New Chapter that one of the courses of action that New Chapter could take was rehabilitating the building, then, necessarily, the condemnation was not an irrevocable crossing of the Rubicon. Rather, the City acknowledged New Chapter's right to enter the building for the purpose of rehabilitating it and eliminating the reasons for the condemnation. Although Henthorn told Linda Zhang, an erstwhile resident of the Hotel, to get out of the Hotel, Linda Zhang was not a repair worker, and the record appears to contain ample evidence of the City's willingness to allow repair work.

¶ 91        In sum, in a bench trial, it is for the circuit court to "determine the credibility of witnesses, the weight to be accorded their testimony, and to resolve inconsistencies and conflicts." *Goldenberg v. Bazell*, 219 Ill. App. 3d 672, 678 (1991). We will not substitute our judgment for that of the circuit court unless the circuit court's findings are against the manifest weight of the evidence. *Id.* A finding is against the manifest weight of the evidence only if the evidence in the record clearly requires the opposite finding or if the finding is "arbitrary, unreasonable, or not based in evidence." *Samour, Inc. v. Board of Election Commissioners of City of Chicago*, 224 Ill. 2d 530, 544 (2007). This standard "affords great deference to the trial court because the trial court is in a superior position to determine and weigh the credibility of the witnesses, observe witnesses' demeanor, and resolve conflicts in their testimony." *Wade v. Stewart Title Guaranty Co.*, 2017 IL App (1st) 161765, ¶ 59. It is not our place to retry this case. The circuit court did not have to believe Dr. Zhang over Henthorn. The court could have found Henthorn to be more credible. The evidence does not require a finding that, from March 25, 2019, onward, the City absolutely prohibited everyone (other than itself) from setting foot in the Hotel. Instead, the evidence could reasonably support a finding that, from March 25, 2019, onward, the City prohibited anyone from setting foot in the Hotel who was not doing remediation work. Such a finding would not be against the manifest weight of the evidence. Our standard of review is deferential. We have no authority to substitute our own evidentiary analysis for that of the circuit court.

¶ 92        Apart from this factual or evidentiary problem, New Chapter's theory of unclean hands suffers from a legal problem: the authorization to demolish the Hotel and the imposition of municipal fines for code violations are not equitable relief—at least New Chapter does not contend that they are, let alone cite any authority that they are. See *Jackson v. Board of Election*

*Commissioners*, 2012 IL 111928, ¶ 27. "Under the 'clean hands' doctrine, a party who has been guilty of misconduct, fraud, or bad faith in connection with the matter in dispute is prohibited from coming to court and asking for *equitable relief*." (Emphasis added.) *Id.* ¶ 26. Equitable relief is that which a court of equity could have awarded "during the days of the divided bench" (*Montanile v. Board of Trustees of National Elevator Industry Health Benefit Plan*, 577 U.S. 136, 142 (2016)), before the fusion of courts of law and courts of equity (see *In re Marriage of Rodriguez*, 131 Ill. 2d 273, 283 (1989)). Examples of equitable relief are an injunction, mandamus, and restitution. See *Mertens v. Hewitt Associates*, 508 U.S. 248, 256 (1993). The relief that the City sought in this case was twofold: (1) authorization to demolish the property and (2) fines. New Chapter has failed to establish, by citation of authorities, that either were equitable relief, as opposed to relief that would be awardable in a court of law. The doctrine of unclean hands, therefore, is inapplicable.

¶ 93                    C. Meaningful Notice of Violations

¶ 94          Quoting *Baldwin v. Hale*, 68 U.S. 223, 233 (1863), New Chapter observes that " '[p]arties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.' " New Chapter complains that, as of September 17, 2019, when the City posted a condemnation notice on the Hotel, New Chapter "still had not received any meaningful notice of what specifically it had to do to remediate the property to satisfy the City *** [and] the County *** or why the property was being condemned."

¶ 95          But New Chapter did receive such notice before September 17, 2019. The "Notice of Code Violation," which the City sent to New Chapter on May 2, 2019, listed the sections of the City's ordinances, the Illinois Compiled Statutes, and the International Property Maintenance Code (adopted by City ordinance) that New Chapter allegedly had violated. New Chapter claims

that "the City acted in bad faith in that the May 2, 2019[,] Notice of Violation and the July 6, 2022[,] Notice of Violation merely cite ordinance numbers and state the building in question is unsafe, respectively." We are aware of no case holding, however, that asserting a violation of a specific section of the building code fails to qualify as meaningful notice.

¶ 96    In any event, in his e-mail of November 22, 2019, Szeto provided textual descriptions of the violations. Alongside his citations to City ordinances and the International Property Maintenance Code, Szeto referred to the lack of numbers on the building; stagnant water in the basement; wrappers, cups, broken chairs, and other garbage strewn about the property; weeds and tall grass; the crumbling and potholed parking lot; broken or damaged heating equipment and plumbing; weeds and holes in the driveways; outside panels popping off the building because of water damage; leaks in the roof; crumbling interior walls; cracked paint and plaster; a drop ceiling caving in from water damage; the discharge of groundwater onto the parking lot instead of into the storm sewer; the lack of chlorine in the swimming pool; stagnant water in the pool; and leaky plumbing.

¶ 97    The evidence could be viewed as proving that New Chapter knew, from the beginning, what had to be done to appease the City and the county. On March 12, 2019, Wilder sent New Chapter a notification that an administrative hearing was scheduled for March 22, 2019, and that, at this hearing, New Chapter would be expected to submit "[a] signed contract to repair the roof, the basement issues[,] and the interior water damage." Surely, representatives of New Chapter could see the leaky roof, the flooded basement, and the water-damaged interior of the Hotel.

¶ 98    To obtain bids for the repair of those problems, New Chapter had to know that those problems existed. According to the "In-House Hearing Summary" for March 22, 2019,

White brought to the hearing three bids by "Apex, Excel, and Great Lakes Roofing," but "none [of those bids] were signed." It could be reasonably inferred, from the bids, that New Chapter understood the violations that had to be remediated, otherwise the bids could not have been solicited and prepared. The Health Department warned New Chapter that the City and the Health Department would inspect the property on March 25, 2019, and that if, at that time, "the bids [were] not signed and/or work completed," the Health Department would revoke New Chapter's Hotel permit. The implication was that the violations about which the City and the county were concerned at that point were the subjects of the bids—and that New Chapter, therefore, knew what the violations were.

¶ 99        If New Chapter was unclear how the condition of its property corresponded to the sections cited in the "Notice of Code Violation," all New Chapter had to do was contact Henthorn or Wilder. Typically, the correction of code violations involves repeated interactions between the property owner and the code enforcement officer. Because New Chapter never sought clarification and did not even bother to attend the administrative hearing on June 19, 2019, on the code violations, New Chapter must not have needed clarification. Evidently, the notices, oral and written, that New Chapter had received were meaningful enough that New Chapter had no questions.

¶ 100                    D. Exhaustion of Administrative Remedies

¶ 101        Citing *Beahringer v. Page*, 204 Ill. 2d 363 (2003), New Chapter says, "It is well-settled law in this State that where administrative remedies are available, they must be exhausted before one can seek *judicial review*." (Emphasis added.) We agree that, generally, a party "must exhaust its administrative remedies prior to judicial review." *Topinka v. Kimme*, 2017 IL App (1st) 161000, ¶ 14. But what is judicial review? It is "[a] court's review of a lower

court's or an administrative body's factual or legal findings." Black's Law Dictionary (12th ed. 2024) (definition of "judicial review").

¶ 102    For example, in *Beahringer*, an inmate requested that the circuit court review a decision by the Illinois Department of Corrections (Department) to confiscate his art materials. See *Beahringer*, 204 Ill. 2d at 365. The Department, in *Beahringer*, did not request that the circuit court review the Department's own decision. Rather, the inmate requested that the court review the Department's decision. Presumably, if the Department were dissatisfied with its own decision to confiscate the inmate's art materials, the Department would have changed its decision and would not have needed the court's help to do so.

¶ 103    "A party generally may not seek judicial relief *from an administrative action* unless the party has exhausted all available administrative remedies." (Emphasis added.) 1 Ill. Law and Prac. *Administrative Law and Procedure* § 18 (2025). In its complaint, the City did not seek relief from an administrative action. Instead of actions for judicial review, count I was an action for a demolition order, and count II was an action for municipal fines. Therefore, the doctrine of exhaustion of administrative remedies was inapplicable.

¶ 104    Under section 1-21.-3 of the Illinois Municipal Code, "The adoption of a municipality of a system of administrative adjudication does not preclude the municipality from using other methods to enforce municipal ordinances." 65 ILCS 5/1-2.1-3 (West 2022). Filing suit in the circuit court was another method, which, despite the City's administrative enforcement procedures, the City was free to use. See *id.*

¶ 105                                III. CONCLUSION

¶ 106    For the foregoing reasons, we affirm the circuit court's judgment.

¶ 107    Affirmed.

- 36 -